UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
WILLIAM BURNS
*Individually and on Behalf of all Others*
*Similarly Situated,*

                        Plaintiffs,

      -against-

FALCONSTOR SOFTWARE, INC., et al.,

                  Defendants.
---------------------------------------------------------------X
THERESA BLACK,
*Individually and on Behalf of all Others*
*Similarly Situated,*

                        Plaintiffs,

      -against-

FALCONSTOR SOFTWARE, INC., et al.,

                  Defendants.
---------------------------------------------------------------X

**REPORT AND
RECOMMENDATION**

10 CV 4572 (ERK)

10 CV 4632 (ERK)

      On March 3, 2014, this Court held a fairness hearing in the above captioned case to

determine whether to recommend approval of the proposed settlement of the claims asserted in

the litigation, the terms of which are set forth in a Stipulation and Agreement of Settlement, dated

May 6, 2013 (the "Stipulation").   For the reasons set forth below, the Court respectfully

recommends that the Stipulation and Agreement of Settlement be approved.

<u>FACTUAL BACKGROUND</u>

      On October 1, 2010, a securities class action was commenced against defendant

FalconStor Software, Inc. ("FalconStor" or the "Company"), and certain of its present and former

officers and directors, including ReiJane Huai ("Huai") and James Weber ("Weber"), alleging

violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange

Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15

U.S.C. §§ 78(j)(b) and 78(t), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

(Compl.[1] ¶ 2).  The action was subsequently consolidated with a separate action commenced by

Theresa Black[2] on October 8, 2010.  The consolidated action seeks damages on behalf of all

persons who purchased or otherwise acquired FalconStor common stock (the "Class") between

March 12, 2008[3] and September 29, 2010, inclusive (the "Class Period") (Am. Compl.[4] ¶ 3).

The Class claims are based on an allegation that during the Class Period, defendants

engaged in an illicit scheme to bribe employees of JPMorgan Chase & Co. to purchase

FalconStor's products and services (id. ¶¶ 5, 6); that defendants failed to disclose the existence of

the bribery scheme in certifications attached to the company's Form 10-K, which was filed with

the Securities and Exchange Commission (SEC) pursuant to the Sarbanes-Oxley Act of 2002

("SOX"); and that as a result, investors were unaware that because of this criminal conduct,

FalconStor's revenues were inflated and their stock prices were also inflated.  (Id. ¶¶ 35-39, 40).

_____

[1]Citations to "Compl." refer to the plaintiffs' original Complaint, dated October 1, 2010, bearing Docket No. 10 CV 4572.

[2]The Black v. FalconStor Software, Inc. action was filed under Docket No. 10 CV 4632.

[3]The Class Period as defined by the original Complaint ran from February 5, 2009 through September 29, 2010.  (Compl. ¶ 1).

[4]Citations to "Am. Compl." refer to plaintiffs' Consolidated Amended Complaint, filed on December 19, 2011.  The plaintiffs filed their first amended complaint on November 3, 2011 after the Court appointed Burns as Lead Plaintiff and approved Burns' counsel as Class counsel. Plaintiffs then filed a second amended complaint to substitute the Estate of ReiJane Huai for Huai.  (See discussion infra at 3-4).

2

According to the Complaint, by the end of December 2009, the Company reported revenue shortfalls that caused the stock price to fall, damaging the investors. (Id. ¶ 9). On September 29, 2010, the Chairman, Chief Executive Officer, and President of FalconStor, ReiJane Huai, resigned from the Company. (Id. ¶ 10). Due to Huai's resignation and certain revelations regarding the improper payments, the price of the Company's stock fell 22.4%. (Id. ¶¶ 52, 53). On September 26, 2011, defendant Huai committed suicide, days before he was scheduled to take a plea to certain criminal charges. (Id. ¶ 12).

Following the briefing of a motion to dismiss and a mediation session with David Geronemus, the parties eventually reached a settlement of the case. (Kim Decl.[5] ¶ 8).

On October 9, 2013, this Court issued a Report and Recommendation, recommending that the district court provisionally certify a Rule 23 Class for settlement purposes only,[6] consisting of all persons who purchased or otherwise acquired FalconStor common stock between March 12, 2008 and September 29, 2010, inclusive. See Fed. R. Civ. P. 23(c)(1); Collier v. Montgomery Cnty Hous. Auth., 192 F.R.D. 176, 181 (E.D. Pa. 2000) (holding that "the court can make a conditional determination of whether an action should be maintained as a class action, subject to final approval at a later date"). This Court further recommended that the district court grant preliminary approval of the proposed settlement, as articulated in the Settlement Agreement;

---

[5] Citations to "Kim Decl." refer to the Declaration of Phillip Kim in Support of Lead Plaintiff's Motion For: (1) Final Approval of Proposed Class Action Settlement; and (2) Award of Counsel Fees, Reimbursement of Expenses, and Award to Lead Plaintiff, dated January 27, 2014.

[6] As noted in this Court's earlier Order, defendants did not oppose conditional certification of the Class for settlement purposes only.

appoint plaintiff Burns as the representative of the Rule 23 Class and appoint the Rosen Law

Firm, P.A., as Class Counsel; and approve the proposed Notice of Class Action Settlement and

the proposed method of distribution.  On October 28, 2013, the district court adopted the Report

and Recommendation.

On March 3, 2014, the Court held a Fairness Hearing at which time the parties asked the

court to approve the Settlement as agreed upon by all parties.  This includes a total proposed

settlement fund of $5,000,000 in cash, as memorialized in the Stipulation and Agreement of

Settlement filed with the Court on June 14, 2013 (the "Stipulation").  Of this $5,000,000 total,

plaintiffs' counsel seeks an award of attorneys' fees amounting to one-third (33.3%) of the total

settlement fund, or $1,666,666, plus $20,271.28 in out-of-pocket expenses, and a $1,000 award to

the Lead Plaintiff.  (Kim Decl. ¶¶ 4, 16, 18, 86).  According to plaintiffs' counsel, notice of the

proposed settlement was sent to 9,393 potential Class members, and published electronically over

*GlobeNewswire* and print in the *Investor's Business Daily*.  (Id. ¶¶ 7, 62, 66; Bravata Decl.[7] ¶¶ 5,

7).  As of January 27, 2014,[8] Strategic Claims Services, the claims administrator, had received

2,337 claim forms, and no objections to the proposed Settlement. (Bravata Decl. ¶¶ 10, 11).

Based on the number of claims submitted, each Class member will receive approximately 46.6%

of their total damages, after subtracting for attorneys' fees and expenses.[9]

---

[7]Citations to "Bravata Decl." refer to the Declaration of Josephine Bravata Concerning Mailing of Notice of Pendency and Proposed Settlement of Class Action and Proof of Claim and Release, dated January 27, 2014, and attached as Exhibit 1 to the Kim Declaration.

[8]The deadline for submitting claims forms was January 20, 2014. (Bravata Decl. ¶ 11).

[9]According to plaintiffs' damage calculations, the maximum loss to the entire Class totaled approximately $28.7 million, of which the agreed-upon settlement amount of $5,000,000 represents a recovery of 17.4%. (Kim Decl. ¶ 58).  Defendants disagree that the total losses as

For the reasons set forth below, the Court respectfully recommends that the Settlement be approved.

DISCUSSION

A.  Approval of the Rule 23 Class Settlement

    1.  Standards

To grant approval of a class settlement under Rule 23(e), the Court must determine that the proposed settlement is "fair, adequate, and reasonable, and not the product of collusion." Joel A. v. Giuliani, 218 F.3d 132, 138 (2d Cir. 2000) (citations omitted); see Fed. R. Civ. P. 23(e). Judicial policy favors the settlement and compromise of class actions. Wal-Mart Stores, Inc. v. Visa U.S.A. Inc., 396 F.3d 96, 116-17 (2d Cir. 2005); see also In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 535 (3d Cir. 2004). Whether a settlement is fair is a determination within the sound discretion of the court. Levitt v. Rodgers, 257 F. App'x 450, 453 (2d Cir. 2007) (citing In re Ivan F. Boesky Sec. Litig., 948 F.2d 1358, 1368 (2d Cir. 1991)).

In City of Detroit v. Grinnell Corporation, the Second Circuit enumerated nine factors to guide courts in evaluating the substantive fairness of a proposed settlement:

> (1) [T]he complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of

---

calculated by plaintiffs is that high. (Id. ¶ 11).

reasonableness of the settlement fund in light of the best possible
recovery; and (9) the range of reasonableness of the settlement fund
to a possible recovery in light of all the attendant risks of
litigation[.]

495 F.2d 448, 463 (2d Cir. 1974) (internal citations omitted), abrogated on other grounds,

Goldberger v. Integrated Res., Inc., 209 F.3d 43 (2d Cir. 2000) ("Grinnell I"); see also D'Amato

v. Deutsche Bank, 236 F.3d 78, 86 (2d Cir. 2001); Garcia v. Pancho Villa's of Huntington Vill.,

No. 09 CV 486, 2012 WL 5305694, at *4 (E.D.N.Y. Oct. 4, 2012).

The court must also determine if the settlement was "achieved through arms-length

negotiations by counsel with the experience and ability to effectively represent the class's

interests." Becher v. Long Island Lighting Co., 64 F. Supp. 2d 174, 178 (E.D.N.Y. 1999) (citing

Weinberger v. Kendrick, 698 F.2d 61, 73-74 (2d Cir. 1982)); see also D'Amato v. Deutsche

Bank, 236 F.3d at 85 (noting that the district court must "determine[] a settlement's fairness by

examining the negotiating process leading up to the settlement as well as the settlement's

substantive terms"); In re Nissan Radiator/Transmission Cooler Litig., No. 10 CV 7493, 2013

WL 4080946, at *4 (S.D.N.Y. May 30, 2013).  In reviewing a proposed settlement, the court has

the "'fiduciary responsibility of ensuring that the settlement is . . . not a product of collusion, and

that the class members' interests [were] represented adequately.'"  Clement v. American Honda

Fin. Corp., 176 F.R.D. 15, 29 (D. Conn. 1997) (internal citation omitted) (quoting In re Warner

Commc'ns Secs. Litig., 798 F.2d 35, 37 (2d Cir. 1986)).

2.  Analysis of Procedural Fairness

The parties represent that the proposed $5,000,000 settlement was entered into after

6

extensive arm's-length negotiations between counsel that spanned several months' time and included an all-day mediation under the supervision of an independent mediator, David Geronemus, Esq. (Kim Decl. ¶ 8). The plaintiffs contend that the settlement "negotiations were rigorous and at arm's length between experienced counsel." (Id. ¶ 8). See Wal-Mart Stores, Inc. v. Visa U.S.A. Inc., 396 F.3d at 116 (holding that the settlement is presumptively fair when a class settlement has been reached after "arm's-length negotiations between experienced, capable counsel after meaningful discovery").

Indeed, the parties entered into settlement negotiations while a motion to dismiss the complaint was pending before the court. (Id. ¶¶ 38, 39). Moreover, according to the plaintiffs, they engaged in an extensive investigation of the facts that included reviewing documents obtained from the government and the Securities Exchange Commission, and hiring an investigator and a damages expert to advise them as they proceeded with the case. Thus, plaintiffs had a full understanding of the strengths and weaknesses of their legal position.

The Court finds that given that the parties gained sufficient information about the claims through mediation and settlement discussions to allow them to make a reasoned evaluation of the chances of success, and given that the negotiations took place at arms-length with the help of an experienced mediator, the Court finds that there was procedural fairness in reaching the proposed settlement.

    3.  Analysis of Substantive Fairness

        (a)  Complexity, Expense and Likely Duration of the Litigation

Turning to the Grinnell factors, while the expense and likely duration of this litigation is

difficult to assess, the Court notes that defendants vigorously deny liability. (Stipulation at 3). Indeed, defendants denied liability and filed a motion to dismiss the claims in lieu of an Answer. Although the defendants' motion to dismiss was withdrawn once a settlement was reached, the defendants' motion suggests that discovery and a trial in this case would be contested and potentially would be long and complicated.

Moreover, class actions, especially in the context of securities law claims, are inherently complex. See Velez v. Novartis Pharm. Corp., No. 04 CV 9194, 2010 WL 4877852, at *12 (S.D.N.Y. Nov. 30, 2010); see also In re Austrian & German Bank Holocaust Litig., 80 F. Supp. 2d 164, 174 (S.D.N.Y. 2000), aff'd, D'Amato v. Deutsche Bank, 236 F.3d 78 (2d Cir. 2001). In the absence of a settlement, this case would require a substantial expenditure of money and time by both parties in pursuing this litigation. First, the parties would need to engage in substantial discovery that would be necessary to establish liability and damages, including depositions of numerous class members, defendants, and other non-parties. Given the complex nature of the loss calculations and causation issues, both sides would be required to expend funds on expert witnesses and expert reports.

In addition, because this settlement was achieved prior to the disposition of defendants' motion to dismiss, if the case were to proceed, there would be a need to expend additional funds on motion practice, including briefing for and in opposition to certification and decertification, in the event that the case survived the motion to dismiss. As counsel noted during the Fairness Hearing, plaintiffs' theory of liability is a novel one and requires a legal determination that a corporation has an obligation to disclose criminal conduct, such as the bribery scheme here, in the

8

context of a SOX certification – a legal question that has been answered in the negative by the Sixth Circuit. See Zaluski v. United American Healthcare Corp., 527 F.3d 564, 577 (6th Cir. 2008). In addition, defendants have challenged plaintiffs' ability to establish loss causation and even if they can, defendants have presented a damages model that would result in substantially lower damage amounts. (Kim Decl. ¶ 11). Thus, a trial in this matter would likely consume tremendous time and resources and, even assuming plaintiffs were successful in establishing defendants' liability at trial, there is always the potential for an appeal, which would inevitably result in delay and increase costs to all parties.

Finally, as defendants' counsel explained at the Fairness Hearing, FalconStor has three wasting Directors' and Officers' insurance policies totaling $15,000,000 that will continue to be depleted the longer the litigation continues. (Kim Decl. ¶ 9).

Thus, the factor of potential protracted litigation favors settlement.

(b) Reaction of the Class

The second Grinnell factor – the reaction of the Class to the Settlement – also favors approval. Here, notice of the settlement was sent to over 9,000 potential class members, including some highly sophisticated institutional investors, and no one has filed an objection (Bravata Decl. ¶ 10), nor did anyone appear at the Fairness Hearing to object. Moreover, nearly 2,500 investors have submitted claims forms seeking to participate in the settlement.

(c) Stage of Proceedings

As noted supra, plaintiffs' counsel has thoroughly investigated the strengths and weaknesses of the case, consulted with experts to assist plaintiffs in evaluating the facts, and

conducted extensive legal research in responding to the motion to dismiss. (Kim Decl. ¶ 56). In addition, preparing for and attending the day-long mediation provided plaintiffs' counsel with a good understanding of the risks of litigation. (Id.) When counsel has sufficient information to appreciate the merits of the case, settlement is favored. Velez v. Novartis Pharm. Corp., 2010 WL 4877852, at *13; In re Warfarin Sodium Antitrust Litig., 391 F.3d at 537.

### (d)   Range of Reasonableness of Settlement Fund

While there is no way to determine with certainty what amount of damages would be awarded in the event of a successful prosecution of the litigation, see In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig., 718 F. Supp. 1099, 1103 (S.D.N.Y. 1989) (quoting In re "Agent Orange" Prod. Liab. Litig., 597 F. Supp. 740, 762 (E.D.N.Y. 1984) (noting that "[d]ollar amounts are judged . . . in light of the strengths and weaknesses of plaintiffs' case"); Republic Nat'l Life Ins. Co. v. Beasley, 73 F.R.D. 658, 668 (S.D.N.Y. 1977) (citing Milstein v. Werner, 57 F.R.D. 515, 524 (S.D.N.Y. 1972)), settlements have been approved as reasonable where the settlement provides a "meaningful benefit" to the class. In re Metlife Demutualization Litig., 689 F. Supp. 2d 297, 340 (E.D.N.Y. 2010).

Here, according to plaintiffs, the $5,000,000 cash settlement confers an immediate benefit on the Class, which is particularly significant in light of the serious risk that, should the case proceed, the wasting Directors' and Officers' insurance policies will be depleted to pay defendants' attorneys' fees and costs. (Kim Decl. ¶ 9). Moreover, the individual defendants do not appear to have significant personal assets; the wealth of ReiJane Huai is based on the value of

10

FalconStor's stock which has significantly depreciated in value since 2010. (Id.)

Class Counsel has consulted with a damages consultant, whose analysis demonstrates that the settlement amount represents over 17.4% of the damages suffered by the Class. (Id. ¶ 58). At this point, Class Counsel claims to have carefully evaluated the strengths and weaknesses of the matter and similarly evaluated the merits of the settlement, and plaintiffs submit that the settlement amount is "*well above* [the] historical median of class action settlements of similar scope. (Id. ¶ 58); see In re Charter Commc'ns Inc. Sec. Litig., No. MDL 1506, 2005 WL 4045741, at *6 (E.D. Mo. June 30, 2005) (noting that there has been an "average 5.5% - 6.2% of estimated losses recovered in securities fraud class [action] settlements since 1995," and concluding that these percentages are "well within the range of possible approval").

The Court finds that given the difficulties presented in proving their claims, the percentage recovery for the Class members is well with the range of reasonableness.

In summary, on the basis of the foregoing discussion of the Grinnell factors, the Court respectfully recommends that the district court find the terms of the proposed settlement for the Rule 23 Class to be fair and reasonable under the circumstances present in this case.

B. Approval of the Plan of Allocation

Plaintiffs request that the Court approve their plan of allocation. When a court approves a plan of allocation, it must ensure that the distribution of the settlement funds is "fair and reasonable." In re Global Crossing Sec. and ERISA Litig., 225 F.R.D. 436, 462 (S.D.N.Y. 2004). The plan need only have a "reasonable, rational basis" when created by "competent and experienced counsel." Id. (internal quotation marks omitted). Here, the plan of allocation

11

reflects plaintiffs' theory of the case – that the stock price declined due to partial disclosures of the alleged misconduct – and does not compensate losses from sales made prior to the disclosure of the alleged misconduct. (Kim Decl. ¶¶ 69, 70). The plan requires any gains during the Class Period be netted with losses during the Class Period. (Id. ¶ 70). The plan also comports with federal securities law. (Id. ¶ 69). Finally, plaintiffs' counsel formulated the plan of allocation with a financial consultant to ensure it was fair. (Id. ¶ 72). Accordingly, the Court respectfully recommends that the district court approve the plan of allocation.

## C.  Approval of the Requested Attorneys' Fees

Plaintiffs' counsel request an award of attorneys' fees in the amount of $1,660,000, and expenses in the amount of $20,271.28. Their fee request represents 33% of the settlement amount, and is based on a multiplier of 4.75 on counsels' lodestar. Counsel argue that this amount is warranted based on the risk involved in the litigation, the complexity of the litigation, the size of the recovery, the experience and ability of counsel, and the fees granted in similar securities class action litigations.

### 1.  The Choice Between the Application of the Percentage of Recovery Analysis or the Lodestar Analysis is Within the Discretion of the District Court

The Second Circuit has long held that a party that has secured a benefit on behalf of a class of people is entitled to recover its costs, including reasonable attorneys' fees, from the common fund created as part of the settlement agreement. See Savoie v. Merchants Bank, 166 F.3d 456, 460 (2d Cir. 1999) ("Savoie II") (citing Savoie v. Merchants Bank, 84 F.3d 52, 56 (2d Cir. 1996) ("Savoie I")). This doctrine, known as the "common fund doctrine," In re Fine Host Corp. Sec. Litig., No. 97 CV 2619, 2000 WL 33116538, at *1 (D. Conn. Nov. 8, 2000), is

12

designed to prevent the unjust enrichment of class members who benefit from a lawsuit without paying for its costs. See Boeing Co. v. Van Gemert, 444 U.S. 472, 478 (1980). In Goldberger v. Integrated Resources, Inc., the Second Circuit held that it is within the discretion of the district court to determine whether to apply a "percentage of recovery" analysis, or a lodestar analysis when determining fees. 209 F.3d 43, 50 (2d Cir. 2000); see also Blessing v. Sirius XM Radio Inc., 507 F. App'x 1, 4 (2d Cir. 2012) (holding that "the reasonableness of a fee [awarded pursuant to a class action] calculated by either [the percentage of recovery or lodestar method] is determined by factors outlined in Goldberger").

In Grinnell I and II, the Second Circuit reasoned that the mathematical computation of the lodestar was "the only legitimate starting point for analysis," Grinnell I, 495 F.2d at 471, and directed the district court to "begin its inquiry . . . by first calculating the basic value of appellee's services," recommending that "district courts should place primary reliance on the value of the time actually expended by fee applicants as determined by normal billing rates." City of Detroit v. Grinnell Corp., 560 F.2d 1093,1098-99 (2d Cir. 1977) ("Grinnell II"). However, district courts applying the lodestar method discovered that it encouraged plaintiffs' lawyers "to run up the number of hours for which they could be paid," created a disincentive to early settlements, and resulted in a waste of judicial resources as the courts were forced to review every item billed. Goldberger v. Integrated Res., Inc., 209 F.3d at 48-49.

Thereafter, the Supreme Court in Blum v. Stenson resurrected the viability of the percentage-of-the fund method by noting, in dicta, that "under the 'common fund doctrine' . . . a reasonable fee is based on a percentage of the fund bestowed on the class . . . ." 465 U.S. 886,

900 n.16 (1984); see also In re Fine Host Corp. Sec. Litig., 2000 WL 33116538, at *2 (noting that the Third Circuit repudiated its earlier endorsement of the lodestar method in Lindy Bros., and returned to a percentage of the fund analysis). While many of the circuits across the nation settled on the percentage of recovery method in common fund cases, the courts within the Second Circuit exhibited uncertainty throughout the 1990s as to which method, lodestar or percentage of recovery, was preferred. Compare In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig., 724 F. Supp. 160, 166 (S.D.N.Y. 1989) (stating that the lodestar method "is not an ideal way to fix fees"), with Wallace v. Fox, 7 F. Supp. 2d 132, 138-39 (D. Conn. 1998) (finding lodestar approach still required in Second Circuit despite the Supreme Court's statement in Blum). As at least one court in the Second Circuit has noted, however, the definite trend within the circuit since the late 1980s was toward the use of the percentage of recovery method. See In re Crazy Eddie Sec. Litig., 824 F. Supp. 320, 325-26 (E.D.N.Y. 1993) (citations omitted).

In Goldberger v. Integrated Resources, Inc., a securities class action stemming from the Drexel, Burnham, Lambert/Michael Milken securities fraud cases of the 1980s, plaintiffs' counsel sought 25% of the $54 million recovery. The district judge declined to award that amount, instead awarding 4% of the recovery, based on a lodestar of counsel's hours. Counsel appealed, claiming that application of the lodestar method, rather than percentage of the fund, was an error by the district court. 209 F.3d at 44-45. On appeal, the Second Circuit rejected counsel's argument "to 'junk' the lodestar altogether," holding that "either the lodestar or percentage of the recovery methods may properly be used to calculate fees in common fund cases, and that the district court did not abuse its discretion in choosing the lodestar in this case." Id. at 45, 50. The

14

court noted that this holding was consistent with the earlier Grinnell opinions which suggested the use of a lodestar analysis, because "[t]he express goal of the Grinnell opinions was to prevent unwarranted windfalls for attorneys [and] [s]o long as that object is achieved, we see no need to compel district courts to undertake the 'cumbersome, enervating, and often surrealistic process' of lodestar computation." Id. at 49-50 (quoting Savoie II, 166 F.3d at 461, n.4) (citing Grinnell II, 560 F.2d at 1098-1099, and Grinnell I, 495 F.2d at 469-71). The court also noted that "the lodestar remains useful as a baseline even if the percentage method is eventually chosen." Id. at 50. Perhaps most importantly, the Court of Appeals stressed the fact that fees awarded "may not exceed what is 'reasonable' under the circumstances," id. at 47 (citation omitted), and noted that although either option, lodestar or percentage of recovery, is available to the district court in setting attorneys' fees, the same criteria should guide a court in applying either method:

> [N]o matter which method is chosen, district courts should continue to be guided by the traditional criteria in determining a reasonable common fund fee, including: "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation . . . ; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations."

Id. at 50 (quoting In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig., 724 F. Supp. at 163 (summarizing the Grinnell opinions)).

### 2. The Trend in the Second Circuit

Although the Second Circuit has left it to the discretion of the district courts to decide the method to use for setting fees in common fund cases, recent cases have indicated that the trend for courts in this circuit is to use the percentage of the fund method. McDaniel v. County of

15

Schenectady, 595 F.3d 411, 417, 419 (2d Cir. 2010) (acknowledging that "the trend in this Circuit is toward the percentage method," but affirming district court's use of the lodestar method because the district court was more familiar with "the nuances of the case"); Asare v. Change Grp. of New York, Inc., No. 12 CV 3371, 2013 WL 6144764, at *16-17 (S.D.N.Y. Nov. 18, 2013) (noting that "the percentage method is the preferred method in the Second Circuit for awarding fees in common fund cases").

In urging this Court to apply the percentage method to determine the appropriate amount of fees to be awarded in this case, plaintiffs' counsel argue that one-third (33.3%) is a proper benchmark for percentage fee awards in this circuit. (See Pls.' Mem.[10] at 25). Plaintiffs cite three cases in support of their argument that 33.3% is appropriate here. See, e.g., In Re Blech Sec. Litig., No. 94 CV 7696, 2002 WL 31720381, at *1 (S.D.N.Y. Dec. 4, 2002) (awarding 33-1/3% of $2,795,000 settlement fund where cumulative lodestar was $5.4 million); Becher v. Long Island Lighting Co., 64 F. Supp. 2d 174, 182 (E.D.N.Y. 1999) (awarding 33-1/3% of $7.8 million settlement fund where that amount was only 66% of lodestar); Berchin v. General Dynamics Corp. No. 93 CV 1325, 1996 WL 465752, at *2 (S.D.N.Y. Aug. 14, 1996) (noting that sliding scale recovery was appropriate, and awarding 33-1/3% of the first $3 million of the settlement, 25% of the second $3 million, and 15% of any additional recovery). Plaintiffs also rely on a study of securities class action settlements conducted by NERA Economic Consulting, which states that from January 1996 to December 2009, settlements below $5 million had median

_____

[10]Citations to "Pls.' Mem." refer to the Memorandum of Law in Support of Lead Plaintiff's Motion for: (1) Final Approval of Proposed Class Action Settlement and (2) Award fo Counsel Fees, Reimbursement of Expenses, and Award to Lead Plaintiff, filed January 27, 2014.

attorneys' fees of 33.3% with 30% being awarded from January 2010 to December 2012. (Pls.' Mem. at 25 (citing Kim Decl. Ex. 4 at 34)). For settlements between $5 million and $10 million, median attorneys' fee awards represented 30% for all periods. (Id.)

Courts have significant discretion in awarding attorneys' fees. Courts in this circuit routinely grant attorneys' fees of 30% to 33-1/3% in class action cases where counsel's fee was contingent on success. See Khait v. Whirlpool Corp., No. 06 CV 6381, 2010 WL 2025106, at *8 (E.D.N.Y. Jan. 20, 2010) (citing cases and awarding attorneys' fees equal to 33% of $3 million fund); see also In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig., No. 05 MD 172, 2014 WL 92465, at *6 (E.D.N.Y. Jan. 10, 2014) (awarding fees on a graduated schedule, including 33.3% to the first $10 million of the settlement, and noting it is "very common" to see 33% contingency fees in settlements less than $10 million); Gay v. Tri-Wire Eng'g Solutions, Inc., No. 12 CV 2231, 2014 WL 28640, at *12 (E.D.N.Y. Jan. 2, 2014) (awarding 35.3% of $183,123.60 settlement fund where the total fees equaled a reasonable lodestar amount); Mohney v. Shelly's Prime Steak, Stone Crab & Oysters Bar, No. 06 CV 4270, 2009 WL 5851465, at *1, 5 (S.D.N.Y. Mar. 31, 2009) (awarding 33% of $3,625,000 fund); Maley v. Del Global Techs. Corp., 186 F. Supp. 2d 358, 370 (S.D.N.Y. 2002) (awarding 33-1/3% of $11.5 million settlement); Steiner v. Williams, No. 99 CV 10186, 2001 WL 604035, at *7 (S.D.N.Y. May 31, 2001) (awarding 30% of $20 million fund because plaintiffs' argument was "novel and risky" and because "counsel took a tremendous risk that, in the end, nothing would be recovered"); but see Cassese v. Williams, 503 F. App'x 55, 59 (2d Cir. 2012) (affirming district court's reduction of fees from 30% to 13%), cert. denied, Komar v. Cassese, 133 S.Ct. 2023

17

(2013); City of Livonia Emps. Ret. Sys. v. Wyeth, No. 07 CV 10328, 2013 WL 4399015, at *3-4

(S.D.N.Y. Aug. 7, 2013) (reducing requested fee from 24.5% to 20% of $67.5 million fund); In

re Dreyfus Aggressive Growth Mut. Fund Litig., 2001 WL 709262, at *7 (awarding fees equal to

15% of the common fund).

### 3. A 33.3% Fee Award is Fair and Reasonable

Having considered plaintiffs' counsel's request for an award of fees in the amount of

$1,666,666, representing 33.3% of the total settlement, the Court finds that such a request is

reasonable, given an application of the Goldberger criteria for determining a reasonable

percentage fee and the trend in this circuit toward similar awards.

Turning to the first Goldberger criterion, the time and labor expended by counsel, this

factor favors a sizeable fee award here. Counsel claim to have expended over 671.5 hours on this

case for a total lodestar of $350,894.50. (Kim Decl. ¶ 82). This represents the hours billed by six

attorneys and two paralegals from the Rosen Law Firm. Plaintiff's counsel conducted extensive

factual investigation, obtained the relevant documents, researched the law regarding claims and

potential defenses, researched and drafted opposition to defendants' motion to dismiss, consulted

with experts, prepared for and participated in mediation, and drafted the relevant settlement

documents. (Pls.' Mem. at 22). Given that this action took nearly four years, plaintiffs' law firm

did not bill a substantial number of hours. The parties did not engage in full discovery and the

litigation did not go beyond the initial motion to dismiss. Additionally, the parties only appeared

before the Court three times, and the primary docket sheet shows 83 docket entries. However, the

docket sheet does not reflect the time counsel expended conducting outside research, discussing

the case with experts, and taking part in the mediation. Additionally, counsel should not be penalized for entering into early settlement. See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d at 121 (noting that the lodestar could create disincentive for plaintiffs' counsel to reach early settlement).

The second Goldberger criterion – the magnitude and complexities of the litigation – also favors plaintiffs' fee award. There were over 9,000 potential class members implicated, which made this a sizable class and required a great deal of coordination and effort on the part of plaintiffs' counsel.

With respect to the third criterion – risk of success – the Goldberger court noted that "[w]e have historically labeled the risk of success as 'perhaps the foremost' factor to be considered in determining whether to award an enhancement." Goldberger v. Integrated Res., Inc., 209 F.3d at 54 (quoting Grinnell I, 495 F.2d at 471). Therefore, although the risk of the litigation may nominally be listed as the "third" Goldberger criterion, the courts consider this factor to be the most important in determining the reasonableness of a fee award. Given the facts of this litigation, it is clear that from the beginning there were substantial risks involved this litigation. Plaintiffs' counsel dedicated substantial attorneys' hours and incurred over $20,000 in expenses on a wholly contingent basis. Additionally, plaintiffs' counsel faced risks in continuing the litigation due to defendants' wasting insurance policy and the fact that defendants had few remaining assets. (Pls.' Mem. at 23). Furthermore, the case was one of first impression in this circuit, and plaintiffs faced a substantial risk given that the Sixth Circuit had previously decided the issue of requiring the disclosure of criminal conduct in the context of SOX certification in the

19

negative.

Additionally, the likelihood of settlement is rarer today than it has been in the past. The Goldberger court noted that 90% of these class action cases settle, 209 F.3d at 52 – a statistic further supported by an empirical study published in the Stanford Law Review, which notes that there appears to be no appreciable risk of non-recovery in securities class actions, because "virtually all cases are settled." See Janet Cooper Alexander, Do the Merits Matter? A Study of Settlements in Securities Class Actions, 43 Stan. L. Rev. 497, 578 (1991). However, the NERA study cited by plaintiffs shows that, increasingly, cases are almost as likely to be dismissed as they are to settle. (Kim Decl., Ex. 4 at 23). The study states that "dismissal rates appear to be rising." (Id. at 24). Therefore, counsel was relatively successful in negotiating a settlement.

The fourth Goldberger criterion, the quality of representation, favors a sizeable fee award. This Court is familiar with the collective experience of counsel through its review of the firm resumés presented to the Court by counsel and is familiar with the work performed on the case based on its interaction with counsel. This Court has no doubt that counsel are experienced in this field and that they represented the class successfully. This is further evidenced by the size of the recovery counsel were able to obtain for the class, as the settlement recovered 17.4% of the damages plaintiff's expert estimated were provable at trial. As was noted, however, this estimate is likely high and would only be recovered at trial if the plaintiffs succeeded on all claims and on all theories of recovery. (Kim Decl. ¶¶ 11, 58). Additionally, defendants were represented by Paul, Weiss, Rifkind, Wharton & Garrison LLP and Cravath, Swaine & Moore LLP, experienced counsel who provided high quality, vigorous opposition. (Pls.' Mem. at 24).

20

The fifth Goldberger criterion, the relation of the requested fee to the settlement, speaks in favor of awarding the one-third of the settlement requested here as the fee. First, the Court must assess whether the settlement unduly benefits counsel. As the Second Circuit has noted, "[t]he express goal of the Grinnell opinions was to prevent unwarranted windfalls for attorneys." Goldberger v. Integrated Res., Inc., 209 F.3d at 49 (citing Grinnell II, 560 F.2d at 1098-1099, and Grinnell I, 495 F.2d at 469-71). Here, awarding a 33.3% fee is in line with or slightly higher than other settlements of this size. (See Kim Decl. Ex 4 at 34 (arguing that settlements between $5 million and $10 million have a median attorney fee of 30%)). See In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig., 2014 WL 92465 at *6 (awarding 33.3% fee for the first $10 million of settlement, and noting it is "very common" to see 33% contingency fees in settlements less than $10 million); Khait v. Whirlpool Corp., 2010 WL 2025106 at *8 (awarding 33% of $3 million fund).

The sixth and final Goldberger criterion, public policy considerations, also favors the fees requested. Obtaining competent counsel to take on large cases such as these on a contingent basis furthers an important public policy. Counsel should be encouraged to take on lawsuits which protect investors and consumers. As plaintiffs' counsel notes, private securities class actions "provide 'a most effective weapon in the enforcement' of the securities laws and are 'a necessary supplement to [SEC] action.'" (Pls.' Mem. at 21 (quoting Bateman Eichler, Hill Richards, Inc. v. Berner, 472 U.S. 299, 310 (1985) (internal citation omitted) (alteration in original)).

Having considered the Goldberger criteria, this Court recommends that plaintiffs' attorneys be awarded a fee of $1,666,666, which is the equivalent of 33.3% of the $5 million

common fund created as a result of this settlement. The 33.3% fee award also appears reasonable based on a "cross-check" of the percentage award against the lodestar, which is 4.75 times $350,894.50. See Wal-Mart Stores Inc. v. Visa U.S.A., Inc., 396 F.3d at 123; Maley v. Del Global Techs. Corp., 186 F. Supp. 2d at 371 (noting that a multiplier of 4.65 is "modest[,] . . . fair and reasonable").

4.     Expenses

Plaintiffs' counsel requests reimbursement of $20,271.28 in litigation costs, including online legal research, copying costs, postage, court filing fees, retaining an expert witness and private investigator, and mediation fees. (Kim Decl. ¶ 84). The Court may award counsel reasonable out-of-pocket expenses that were necessary to successfully litigate and resolve the action. See In re Metlife Demutualization Litig., 689 F. Supp. 2d at 363-64 (citing cases); In re Global Crossing Sec. and ERISA Litig., 225 F.R.D. at 468 (reimbursing $3.5 million in expenses, including "investigative and expert witnesses, filing fees, service of process, travel, legal research and document production and review" because they were "the type for which 'the paying, arms' length market' reimburses attorneys"). Here, counsel has established that the expenses were necessary to the litigation, and the Court finds they are reasonable given the size of the suit and the fact that plaintiff consulted with several experts. Accordingly, the Court recommends awarding plaintiffs' counsel $20,271.28 in litigation expenses.

5.     Nominal Award for Lead Plaintiff

Lead Plaintiff requests an award of $1,000 in connection with the costs and expenses he

incurred representing the Class.  The PSLRA authorizes the lead plaintiff to recover an award of "reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class, " 15 U.S.C. § 78u-4(a)(4), as well as the "time and effort" expended by lead plaintiff.  In re Metlife Demutualization Litig., 689 F. Supp. 2d at 369.  Here, Lead Plaintiff represented the class by reviewing the complaints, reviewing the settlement, and discussing the matters with counsel.  The award of $1,000 is nominal and allows him to recover for the time and effort he expended representing the class in this litigation.  Accordingly, the Court recommends awarding Lead Plaintiff $1,000.

CONCLUSION

For the reasons stated above, the Court respectfully recommends that the court approve: (1) the proposed settlement, as articulated in the Stipulation and Agreement of Settlement; (2) the plan of allocation; (3) the requested one-third of the settlement in attorneys' fees, for a total $1,666,666; (4) the requested $20,271.28 in expenses; and (5) the $1,000 award to plaintiff Burns as the representative of the Rule 23 Class.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within fourteen (14) days of receipt of this Report.  Failure to file objections within the specified time waives the right to appeal the District Court's order.  See 28 U.S.C. § 636(b)(1) (2009); Fed. R. Civ. P. 6(a), 6(d), 72(b); Small v. Secretary of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

The Clerk is directed to send copies of this Report and Recommendation to the parties

23

either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED**.

Dated: Brooklyn, New York
April 10, 2014

/s/  CHERYL POLLAK
Cheryl L. Pollak
United States Magistrate Judge
Eastern District of New York